UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| TINA BRUCE, JAYME BRUCE, a minor, by and through her Guardian Ad Litem, Tina Bruce, and JESSICA BRUCE, a minor, by and through her Guardian Ad Litem, Tina Bruce,<br><br>    Plaintiffs,<br><br>  v.<br><br>CLARK EQUIPMENT COMPANY, BOBCAT COMPANY, MELROE COMPANY, INGERSOLL-RAND COMPANY, WILDS HORTICULTURAL SERVICES, INC., SAMUEL WILDS, and Does 1 through 50, inclusive,<br><br>    Defendants. | NO. CIV. S-05-01766 WBS KJM<br><br><u>ORDER RE: MOTIONS FOR SUMMARY JUDGMENT</u> |

----oo0oo----

    Plaintiffs brought this diversity action seeking damages for the wrongful death of Jerry Bruce ("decedent"), alleging that he fatally injured himself while operating a defective Bobcat skid-steer loader manufactured and/or sold by

1

defendants.  Defendants now bring three motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.

I. <u>Factual and Procedural Background</u>

Defendant Ingersoll Rand Company ("Ingersoll") is a corporation incorporated under the laws of the state of New Jersey. (Def.'s Mot. for Summ. J. Docket No. 26 ("MSJ 1") at 1.) On May 31, 1996, Ingersoll became the sole shareholder of defendant Clark Equipment Company ("Clark"), a corporation incorporated under the laws of Delaware with its principle place of business being in New Jersey. (Not. of Removal 2.) Defendant Bobcat Company (formerly known as Melroe Company) ("Bobcat") is an unincorporated business unit of Clark, responsible for the design, assembly, manufacture, and sale of Bobcat products, including Bobcat skid-steer loaders.[1] (MSJ 1 at 1.)

The Bobcat skid-steer loader is a small vehicle used to dig and move landscaping and building materials, grade, jackhammer cement, load trucks, and perform other construction-related tasks. (Defs.' Mot. for Summ. J. Docket No. 28 ("MSJ 3") Ex. G.)  It consists of a partially-enclosed "operator cab," where a user sits and operates the controls, as well as hand-controlled hydraulic "lift arms" with a "bucket" attached, that can be manipulated via controls in the operator cab. (<u>Id.</u>)

In order to avoid injury while operating the heavy-machinery, the loader has a variety of safety features.  There is a seat belt to keep the operator in their seat, as well as a "Bobcat Interlock Control System (BICS)" seat bar going across

---

[1] Clark originally named the unincorporated business unit Melroe Company, but changed the name to Bobcat Company in 2000.

2

the driver's lap, which must be in the fully lowered position in order for the loader's lift arm controls to function. (MSJ 3 at 8.) In addition, the loader has a "PRESS TO OPERATE" button inside the operator cab, which functions as a track (hydraulic) lock device--if the button is not pressed, the hydraulic lift arm controls will not function.[2] (Id. at 9.) Finally, the loader also has a "lift arm stop," which is an orange-colored, steel attachment designed to lock the lift arms in the up position, preventing them from accidentally lowering during maintenance. (Id. at 3.)

The loader also has numerous warning decals affixed prominently to the body, indicating various dangers that can lead to injury or death. On one side of the loader, a decal reads:

```
                    !DANGER
                  AVOID DEATH
* Attachment can be forced against the ground and cause
  front wheels to raise.
* Never go under or reach under lift arms or lift
  cylinder without an approved lift arm stop installed.
```

(MSJ 3 at 3.) On the other side of the loader, a similar decal reads:

```
                    !DANGER
                  AVOID DEATH
* Keep out of this area when lift arms are raised
  unless supported by lift stop.
* Moving lift arm control or failure of a part can
  cause lift arms to drop.
```

---

[2] Notably, in 1994 Bobcat introduced a "seat sensor" safety mechanism, which prevented operation of the lift arms unless sufficient pressure was applied to the seat, i.e. by an operator being seated. (Opp'n to MSJ 3 at 3.) Four years later, however, this feature was discontinued in favor of the "PRESS TO OPERATE" button, because the seat sensor mechanism occasionally malfunctioned when debris or loose objects rolled under the seat and prevented it from lowering. (Id.)

1  (Id. at 4.)  Both of these warning decals are accompanied by
2  diagrams depicting the dangers described.  (Id. at 3-4.)  The
3  loader also contains an instruction decal regarding proper
4  procedures for operation of the vehicle, which reads:

>    TO OPERATE LOADER:
>    1. Fasten seat belt and lower seat bar.
>    2. Put hand controls in neutral.
>    3. Start engine.
>    4. Activate green "PRESS TO OPERATE" button on left
>       instrument panel.
>    * Both green lights on left hand control must be on
>    * If hydraulic functions do not operate, stop engine.

(Id. at 5.)

Finally, the loader has attached to it a weather-resistant Operator's Handbook, which contains detailed instructions and further safety warnings.  (MSJ 3 at 4.)  The cover of the handbook reads:

>                      !WARNING
>                AVOID INJURY OR DEATH
>    * Never use the loader without instructions.  Read
>      loader signs (decals), Operation & Maintenance Manual,
>      this Handbook and the EMI Safety Manual.
>    * Always fasten seat belt and lower the seat bar before
>      operating the loader.  Keep feet on foot rests.
>    * Before leaving the operator seat:
>        - Lower lift arms.
>        - Put attachment flat on ground.
>        - Stop the engine.  Remove the key.
>        - Engage the parking brake.
>        - Raise the seat bar.
>        (Mechanical Hand Controls:) - Move the
>        hydraulic controls until both lock.
>        ( Advanced Hand Controls:) - Move the
>        hydraulic controls to neutral.

(Id.)  The handbook contains warnings, similar to those on the decals,[3] as well as detailed instructions for safely getting

---

[3]     The handbook warns (in part):
                         !WARNING
                   AVOID INJURY OR DEATH

4

into, and out of, the loader.

Samuel Wilds owns a Bobcat skid-steer loader, which he purchased used from an unnamed third-party. (MSJ 3 at 1.) Mr. Wilds, having known decedent for fifteen years, and knowing him to be an experienced equipment operator, loaned his loader to decedent for personal use. (Id.) On January 19, 2003, decedent was using the loader outside of his house. (Defs.' Mot. for Summ. J. Docket No. 27 ("MSJ 2") at 1.) His daughter, plaintiff Jayme Bruce, was indoors watching television, and did not hear the loader's engine. (Id.) At some point, Jayme went outside to speak with her father, calling to him but receiving no response. (Id.)

As Jayme got within ten to fifteen feet of the loader, she noticed something move, and from five or six feet away, she realized that it was her father who had been seriously injured by the loader.[4] (MSJ 2 at 1-2.) Jayme ran across the street to get help from a neighbor, Gardner Dockum. (Id. at 2.) Mr. Dockum ran across the street and observed the scene, noting that Mr. Bruce's head was "squashed and his face was nearly black," and immediately instructed his wife to call 911. (Id. Ex. 2 (Deposition of Gardner Dockum).)

The first emergency medical technician (EMT) to respond was Mark Beldon, an EMT paramedic and Operations Supervisor with

---

\* Never go under or reach under the lift arms or lift cylinder without an approved lift arm support device installed. Replace if damaged.
(MSJ 3 Ex. G.)

[4] "It looked like a rag that had moved, but as I got closer I noticed it was his head that had moved and it was his hair." (MSJ 2 Ex. 1 (Deposition of Jayme Bruce).)

5

American Medical Response, an ambulance transport company.  (MSJ 2 at 2.)  Mr. Beldon arrived approximately ten to fifteen minutes after the call, and upon examining Mr. Bruce determined that he was dead.  (Id.)  According to the Deputy Coroner Michael Booth, the official cause of death was "traumatic asphyxiation," and decedent died within a matter of "minutes."  (Declaration of Monique Grandaw Ex. D.)

On January 19, 2005, plaintiff Jayme Bruce, along with plaintiff Tina Bruce (decedent's wife) and plaintiff Jessica Bruce (decedent's youngest daughter), filed a complaint for wrongful death in Shasta County Superior Court, which was removed to this court based on diversity jurisdiction.[5]  (Compl.; Not. of Removal.)  Plaintiffs allege: (1) strict products liability; (2) negligence; (3) breach of implied warranty; and (4) negligent infliction of emotional distress.[6]

Defendants now bring three motions for summary judgment: (1) the first motion ("MSJ 1") contends that Ingersoll was merely a shareholder in Bobcat, and thus cannot be held liable under any theory; (2) the second motion ("MSJ 2") seeks summary adjudication on the negligent infliction of emotional distress cause of action, arguing that Jayme Bruce did not contemporaneously perceive the injury; and (3) the third motion ("MSJ 3") asserts that the loader was not, by any definition, defective, and therefore plaintiffs cannot recover.

---

[5] Plaintiffs filed a dismissal of defendants Wilds Horticultural Services and Samuel Wilds on or about August 4, 2005.

[6] The fourth cause of action is brought solely by Jayme Bruce.

6

## II. Discussion

### A. Legal Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' [and] designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e); Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989). However, any inferences drawn from the

underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.  Ingersoll's Motion for Summary Judgment ("MSJ 1")

It is a fundamental rule of corporate formation that a shareholder, be it another corporation or an individual, is not liable for the actions of the corporation. See e.g. Mesler v. Bragg Mgmt. Co., 39 Cal.3d 290, 300 (1985). Plaintiffs do not propose that the court should disregard the corporate form and pierce the corporate veil, but argue that Ingersoll participates directly in placing the Bobcat loaders into the stream of commerce.

California's "stream of commerce" approach "imposes strict liability in tort on all of the participants in the chain of distribution of a defective product." Bostick v. Flex Equip. Co., Inc., 147 Cal. App. 4th 80, 88 (2007). Liability extends to all parties who are part of the "overall producing and marketing enterprise." Fortman v. Hemco, Inc., 211 Cal. App. 3d 241, 251 (1989). Thus, in assigning strict liability, "[i]t is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability." Tauber-Arons Auctioneers Co. v. Superior Court, 101 Cal. App. 3d 268, 275-276 (1980) (citing Kasel v. Remington Arms Co., 24 Cal. App. 3d 711, 724 (1972)).

8

1         However, garnering economic benefit from putting one's
2 brand name on a defective product is not sufficient to result in
3 strict liability. See e.g. Hanberry v. Hearst Corp., 276 Cal.
4 App. 2d 680, 683 (1969) (holding that one who endorses a
5 particular product for economic gain may be held liable if the
6 product is defective, but only based on a claim of negligent
7 misrepresentation).  There is, implicit in the strict liability
8 standard, a requirement that the defendant have some ability to
9 control the manufacturing or distribution of the product. See
10 id. at 687 (refusing to find strict liability because there was
11 no indication the endorser had any involvement in the
12 "manufacturing and supplying process"); see also Bay Summit Cmty.
13 Ass'n v. Shell Oil Co., 51 Cal. App. 4th 762, 778 (1996) (noting
14 the importance, in assigning strict liability, of whether
15 "defendant's role was integral to the business enterprise such
16 that the defendant's conduct was a necessary factor in bringing
17 the product to the initial consumer market; and the defendant had
18 control over, or a substantial ability to influence, the
19 manufacturing or distribution process").
20         The "marketing" activities which plaintiffs assert as
21 the basis for Ingersoll's liability are limited to: 1) brief
22 mention of Bobcat products on Ingersoll's website, with a link to
23 the Bobcat website; and 2) labeling Bobcat products with the
24 Ingersoll-Rand name.  However, mere endorsement of a product by
25 affixing a corporate name or logo is not sufficient to make a
26 party part of the "overall producing and marketing enterprise."
27 Hanberry, 276 Cal. App. 2d at 683; see also Kasel v. Remington
28 Arms Co., 24 Cal. App. 3d 711 (1972).  Plaintiffs' proposed

9

definition of "marketing" would potentially expand strict products liability to include any and all endorsers, well beyond the scope permissible under California law.

While receiving direct financial benefit from such activities may be a factor to consider, a defendant must also have an ability to influence and control the product manufacturing and distribution process. <u>Bay Summit</u>, 51 Cal. App. 4th at 778.  Plaintiffs argue that the branding of Bobcat loaders, in conjunction with the fact that Ingersoll is the sole shareholder of Clark, is sufficient to raise an inference of Ingersoll's control over the loader's production process. However, Ingersoll's uncontroverted evidence shows that Ingersoll does <u>not</u> in fact exercise any such control over the manufacturing and distribution of Bobcat loaders, or over the day-to-day business operations of Clark.  (Ihringer Decl. ¶¶ 7, 8.)  It is undisputed that Clark, and not Ingersoll, is directly responsible for designing, manufacturing, and distributing Bobcat products. (Ihringer Decl. ¶ 6.)  The two are separate corporations and, while Ingersoll is the sole shareholder of Clark, it has no say in these business functions.  (<u>Id.</u> ¶ 7.)  Plaintiffs offer no evidence to refute this fact.

Ultimately, because Ingersoll does not exercise control over the Bobcat loader's design, manufacturing, and distributing process, it cannot be liable under the strict liability "stream of commerce" standard.  Accordingly, the court will grant summary judgment for defendant Ingersoll on strict liability.  Plaintiffs do not oppose dismissal of the negligence cause of action as to Ingersoll.  Accordingly, the court will also grant defendant

10

Ingersoll's motion for summary judgment on the second claim of negligence.[7]

### C. Claim Four ("MSJ 2")

In an action for negligent infliction of emotional distress brought by a bystander, the court must consider: 1) whether plaintiff was located near the scene of the accident; 2) whether "the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident;" and 3) whether plaintiff and the victim were closely related. Dillon v. Legg, 68 Cal. 2d 728, 740-41 (1968); see also Thing v. La Chusa, 48 Cal. 3d 644, 667-68 (1989). The parties do not dispute that Jayme Bruce was located near the scene of the accident and that she was closely related. Defendants, however, argue that Jayme Bruce was not present at the scene of the accident at the time it occurred, and had no contemporary observance of the event, and thus plaintiff's claim fails the second prong.

As a general rule, a bystander plaintiff in an action for negligent infliction of emotional distress must have a contemporary sensory awareness of the accident--being informed of the event after it occurs is not sufficient. Thing, 48 Cal. 3d

---

[7] Given that the claim for negligence fails, a claim for negligent infliction of emotional distress must also fail as a matter of law. "There is no independent tort of negligent infliction of emotional distress," but merely the tort of "negligence, a cause of action in which the duty to the plaintiff is an essential element." Gu v. BMW of N. Am., LLC, 132 Cal. App. 4th 195, 204 (2005) (citing Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 984 (1993)). If there is no duty owed to plaintiffs, the fourth claim thus must also be dismissed. Accordingly, the court will grant summary adjudication for Ingersoll on claim four as well.

11

at 688.  However, when an injury-producing event continues for a period of time, and the plaintiff observes the event while it is still occurring, then recovery is possible.  Ortiz v. HPM Corp., 234 Cal. App. 3d 178, 185 (1991) (allowing recovery for negligent infliction of emotional distress when plaintiff came across her husband pressed between the cylinder and the body of a plastic injection molding machine, because the event causing the injury (oxygen deprivation from being trapped) was still occurring).

Jayme Bruce's claim thus turns on whether she observed her father while the "injury-producing event was still occurring."  Defendants contend that when Jayme came upon her father, he was already deceased and the "event" was no longer in progress.  As evidence of this fact, defendants cite the deposition of Mark Beldon, the first EMT to arrive on the scene, who consoled Jayme by telling her that at the moment she found him "he was most likely already dead."  (MSJ 2 Ex. 3 (Deposition of Mark Beldon 68).)  On the other hand, Jayme Bruce testified that she "noticed that it was his head that had moved" when she first observed her father trapped in the loader.  (Depo. of Jayme Bruce 36:2.)  While not dispositive, evidence that decedent was still moving supports the inference that he was still alive.  Jayme indicates that, to this day, she is unsure whether her father was dead or alive when she saw him.  (Id. 37:16.)  Plaintiff additionally highlights the official coroner's report, which lists the cause of death as "traumatic asphyxia" and indicates that it likely took "minutes" for death to occur.  (Grandaw Decl. Ex. D; MSJ 3 Ex.B (Deposition of Michael Booth).)

Because the evidence lends itself to a plausable

12

inference that Jerry Bruce was still being asphyxiated by the loader when Jayme Bruce found him, this court cannot rule as a matter of law that she did not observe the injury-producing event while it was still occurring. Accordingly, defendants' motion for summary adjudication on claim four must be denied.

    D.    Claims One, Two, and Three ("MSJ 3")

          1.    Claim One - Strict Liability

Under California law, "there are three ways to hold a manufacturer strictly liable for injuries caused by its product: (1) if the product is defectively manufactured; (2) if it is defectively designed; or (3) if it is distributed without sufficient warnings or instructions about its potential for harm." Karlsson v. Ford Motor Co., 140 Cal. App. 4th 1202, 1208 (2006). In this case, plaintiffs argue that the loader was defectively designed.

There are two theories in California by which a plaintiff may establish a design defect. Under the "consumer expectations" test, if a product fails to perform "as safely as an ordinary consumer would expect when using the product in an intended or reasonably foreseeable manner," then it is defective. Id.; Soule v. Gen. Motors Corp., 8 Cal. 4th 548, 550 (1994). The risk-benefit test, on the other hand, seeks to "balance the risk of danger inherent in the challenged design versus the feasibility of a safer design, the gravity of the danger, and the adverse consequences to the product of a safer design." Karlsson, 140 Cal. App. 4th at 1208; Barker v. Lull Eng'g, Co., 20 Cal. 3d 413, 417 (1978).

///

13

a. <u>Consumer Expectations Test</u>

The consumer expectations test is more properly applied when "'ordinary knowledge as to [the product's] characteristics' may permit an inference that the product did not perform as safely as it should." <u>Soule</u>, 8 Cal. 4th at 566; <u>Jones v. John Crane, Inc.</u>, 132 Cal. App. 4th 990, 1001 (2005) (noting that this test is proper when "everyday experience" of the product's users permits a conclusion that the design violated safety expectations, "regardless of expert opinion about the merits of the design"). The test is less appropriate, however, for "a complex product . . . [that] may often cause injury in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance." <u>Soule</u>, 8 Cal. 4th at 566-67.

In this case, the consumer expectations test is not appropriate because of the unusual circumstances that led to decedent's injury. It is undisputed that Mr. Bruce was operating the loader while standing on the ground, outside of the cab, with the BICS seat bar lowered and the "lift arm stop" not engaged. An ordinary Bobcat user's minimum assumptions about loader safety are unlikely to extend to operating the loader in this unusual manner. See <u>Barker</u>, 20 Cal.3d at 430 ("[I]n many situations . . . the consumer would not know what to expect, because he would have no idea how safe the product could be made."). As in <u>Soule</u>, plaintiffs' "theory of design defect [is] one of technical and mechanical detail" and seeks "to examine the precise behavior of several obscure components . . . under the complex circumstances of a particular accident." <u>Id.</u> at 570. Under these

14

1 circumstances, the court will consider the loader's design under
2 the risk-benefit test.
3                b.   <u>Risk-Benefit Test</u>
4         Under the risk-benefit test, the first step of the
5 analysis requires plaintiff to demonstrate that "the injury was
6 proximately caused by the product's design."  <u>Barker</u>, 20 Cal. 3d
7 at 431.  Once plaintiff has satisfied that burden, the defendant
8 must then show that the product is not defective in light of
9 considerations such as "the gravity of the danger posed by the
10 challenged design, the likelihood that such danger would occur,
11 the mechanical feasibility of a safer alternative design, the
12 financial cost of an improved design, and the adverse
13 consequences to the product and to the consumer that would result
14 from an alternative design."  <u>Id.</u>  Defendants, of course, do not
15 have to prove that the current, challenged design is the <u>safest</u>
16 or <u>best</u> design in existence, merely that it is not defective.
17 <u>See</u> <u>Barker</u>, 20 Cal. 3d at 431.  Thus, while evidence of a better
18 design is a legitimate factor to be considered, it is not
19 dispositive of a design defect.  <u>Id.</u>
20         To establish that a product's design was the proximate
21 cause of injury, the plaintiff need only demonstrate that "the
22 defendant's conduct substantially contributed to the injury and
23 the circumstances make it just to hold the defendant responsible
24 for the consequences of the accident."  <u>Bunch v. Hoffinger</u>
25 <u>Indus., Inc.</u>, 123 Cal. App. 4th 1278, 1302 (2004).  In this case,
26 it is undisputed that decedent was operating the loader while
27 standing under the lift arms, outside of the operator's cab.  It
28 is also undisputed that, while operating the loader in this

15

position, the lift arms lowered, pinning decedent such that he was unable to raise them.  The design of the product, defective or not, played a substantial part in Mr. Bruce being pinned in this manner.  Accordingly the burden falls to defendants to demonstrate that the benefits of the design outweigh the risks.

The current design for the Bobcat loader contains a number of safety features designed to prevent injury to the operator, including a seat belt to keep the operator in their seat, the BICS seat bar and "PRESS TO OPERATE" button to prevent manipulation of the lift arm controls while the operator is not seated, and a lift arm stop which can be engaged to prevent the lift arms from lowering.  The loader also has numerous warnings, both in the instruction manual and in decals affixed on the machine, indicating proper and improper operating techniques.  Based on these safety features, defendants contend that the injury very unlikely to occur.

Plaintiffs, however, argue that these features are too easy to circumvent, and that without a safety feature that makes it more difficult to operate the loader while not in the operator's seat, the design is too dangerous and thus defective.  Plaintiffs' expert, certified engineer Al Ferrari, testifies that Bobcat received numerous injury reports of users being hurt while operating the loader from outside of the cab, and was therefore aware of this common and dangerous misuse.  (Ferrari Decl. ¶ 5.)  To combat this, in 1994 Bobcat installed a "seat sensor," a safety feature which prevented the loader's lift arms from operating unless a sufficient amount of pressure was applied to the seat.  (Id. ¶ 6.)  According to Ferrari, the seat sensor was

16

effective in lowering the incidence of accidents among loader operators not properly seated, because it "prevent[ed] operation of the lift arms if the operator is not in the operator's seat." (Ferrari Decl. ¶¶ 7, 8, 19.)  Ferrari concludes that the seat sensor is a feasible alternative design, which does not appreciably interfere with the functioning of the product and would better prevent injuries such as decedent's.  (Id. ¶ 19.)

The seat sensor, however, was not a flawless feature. Mr. Ferrari also testifies that after installing the seat sensors in Bobcat loaders, the company received occasional complaints of the seat sensor malfunctioning.  (Id. ¶ 9.)  Lose objects or dirt could collect under the seat, preventing it from lowering, thereby making it impossible to operate the lift arms.  (Id.) Despite some improvements in the seat sensor, which reduced the incidence of these problems, the malfunction still remained a "nuisance."  (Id.)  The parties dispute, however, exactly how prevalent these difficulties were, or how much they affected the performance of the loader.

Defendants also assert that a seat sensor can be circumvented just as easily as the other, current safety features, for example by pushing down or placing a weight on the seat.  Defendants, however, cite no specific evidence of this fact.  Bobcats were manufactured with seat sensors for approximately four years, and defendants do not present a single accident report of a user being injured after successfully bypassing the seat sensor.  Of course, circumventing a seat sensor might be technically possible, but if the practical effect of the safety feature is to eliminate or dramatically reduce a

17

particular sort of foreseeable injury, then a genuine benefit exists. Indeed, Mr. Ferrari's testimony states that, while the seat sensor may not have always operated perfectly, it had the legitimate and practical effect of preventing users from operating the loader while outside the cab. (Id. ¶¶ 8, 17.)

Accordingly, on the facts presently before it, this court cannot say as a matter of law that the design is not defective. Because disputes still exist regarding the relative risks and benefits of the current and alternate designs, summary judgment on strict liability must be denied.

2. Negligence

To maintain a negligence cause of action, plaintiff must show: (1) that the defendant owed the plaintiff a legal duty; (2) that the defendant breached that duty; and (3) that the breach was a proximate or legal cause of the plaintiff's injury. Baptist v. Robinson, 143 Cal. App. 4th 151, 170 (2006). Negligent design, as opposed to strict liability, focuses on the "reasonableness of the manufacturer's conduct" as opposed to the "condition of the product itself." Barker, 20 Cal.3d at 434. The analysis parallels the "risk-benefit" test, in that the test of negligent design "'involves the balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm.'" Merrill v. Navegar, Inc., 26 Cal.4th 465, 479 (2001) (quoting Pike v. Frank G. Hough Co., 2 Cal. 3d 465, 470 (1970)). Thus, under a negligence theory a plaintiff "must [still] prove that a defect caused an injury," but "must also prove 'an additional element,

namely, that the defect in the product was due to negligence of the defendant." Id.

The existence and scope of a defendant's duty is a legal question to be decided by the court. Butcher v. Gay, 29 Cal. App. 4th 388, 400 (1994); Romito v. Red Plastic Co., 38 Cal. App. 4th 59, 65 (1995). However, "the law now requires a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse." Huynh v. Ingersoll-Rand, 16 Cal. App. 4th 825, 833 (1993) (citation omitted). "[T]he extent to which designers and manufacturers of dangerous machinery are required to anticipate safety neglect presents an issue of fact." Id. (citing Balido v. Improved Machinery, Inc., 29 Cal. App. 3d 633, 645 (1973)).

Defendants argue that decedent's intentional circumvention the loader's safety features was unforeseeable and beyond the scope of any duty that could be imposed in law. This contention is contradicted, however, by plaintiff's expert Ferrari, who testifies that Bobcat was aware, as far back as 1990, that users would occasionally operate Bobcat machines while standing outside of the cab. (Ferrari Decl. ¶ 7.) Indeed, the safety decal on the side of the loader depicts exactly such behavior, i.e. a user being injured while standing under the lift arms. The parties continue to dispute whether defendants were aware that users would operate the loader while standing outside of the cab. Moreover, to the extent that a material dispute of fact exists with regard to whether the product is defective (see

19

1  Section II(D)(1), supra) this also precludes summary judgment on
2  a theory of negligence.  See Merrill, 26 Cal.4th at 479.
3  Accordingly, the court will deny defendants' motion for summary
4  judgment on claim two.
5       E.   Breach of Warranty
6            At oral argument, plaintiffs concede that they have
7  abandoned their breach of warranty claim against all defendants.
8  Accordingly, the court will grant defendants' motion for summary
9  judgment on claim three.
10 III. Conclusion
11           IT IS THEREFORE ORDERED THAT:
12           (1) summary judgment on all claims, as to defendant
13 Ingersoll, be, and the same hereby is, GRANTED;
14           (2) summary judgment on claim three, as to all
15 defendants, be, and the same hereby is, GRANTED;
16           (3) in all other respects, defendants' motions for
17 summary judgment be, and same hereby are, DENIED.
18 DATED:  March 26, 2007

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE